FILED
CLERK, U.S. DISTRICT COURT

9/8/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: ___JB___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

March 2022 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      v.<br><br>AMBER SINGLETON,<br>  aka "Crystal Kelly,"<br>  aka "Rebecca Lee,"<br>  aka "Rebecca A Lee,"<br>  aka "Rebecca Ann Lee,"<br>  aka "Mia Lockett,"<br>  aka "Mia Peire Lockett,"<br>  aka "Crystal McClellan," and<br>EMANUEL TUCKER,<br><br>      Defendants. | CR    2:22-cr-00406-JLS<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1349: Conspiracy to Commit Bank Fraud and Wire Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 1344(2): Bank Fraud; 18 U.S.C. § 1956(h): Money Laundering Conspiracy; 18 U.S.C. § 957: Money Laundering; 18 U.S.C. § 982: Criminal Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1349]

[ALL DEFENDANTS]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

THE DEFENDANTS

1.   Defendant AMBER SINGLETON, also known as ("aka") "Crystal Kelly," aka "Rebecca Lee," aka "Rebecca A Lee," aka "Rebecca Ann Lee," aka "Mia Lockett," aka "Mia Peire Lockett," aka "Crystal McClellan," was a resident of Canyon Lake, California.  Defendant SINGLETON purported to be an employee of a California company called Finland Systemics, Inc. ("Finland Systemics"), which did business under the name Finland Financial, Inc.

2.   Defendant EMANUEL TUCKER was a resident of Canyon Lake, California, where he lived with defendant SINGLETON.  Defendant TUCKER purported to be the Chief Executive Officer ("CEO") of a company called Finland Financial, Inc. ("Finland Financial").  Defendant TUCKER also purported to be the CEO and registered agent of a California company called Drynk, Inc. ("Drynk").

THE PAYCHECK PROTECTION PROGRAM

3.   The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 that was designed to provide emergency financial assistance to Americans suffering economic harm as a result of the COVID-19 pandemic.  One form of assistance provided by the CARES Act was the authorization of United States taxpayer funded forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

4.   In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business.  The PPP loan application required the small business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  One such certification required the applicant to affirm that "[t]he [PPP loan] funds w[ould] be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments."  The applicant (through its authorized representative) was also required to acknowledge that "I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges."  In the PPP loan application, the applicant was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.  In addition, the applicant was required to provide documentation showing its payroll expenses.

5.   A business's PPP loan application was received and processed, in the first instance, by a participating financial institution approved by the United States Small Business Administration ("SBA").  If a PPP loan application was approved, the participating financial institution would fund the PPP loan using its own monies.  The SBA guaranteed the loans funded under the PPP.

6.   PPP loan proceeds were required to be used by the business on certain permissible expenses, namely, payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business

3

spent the loan proceeds on these expenses within a designated period of time and used at least a minimum amount of the PPP loan proceeds towards payroll expenses.

7.    The PPP also allowed certain eligible borrowers that had previously received a PPP loan to apply for a second PPP loan, with the same general loan terms as their first PPP loan.  These "second-round" loans could be used for the same purposes as were permitted for the first PPP loans, including payroll costs, interest on mortgages, rent, and utilities.

THE ECONOMIC INJURY DISASTER LOAN PROGRAM

8.    The Economic Injury Disaster Loan Program ("EIDL") was a United States SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

9.    The CARES Act authorized the SBA to provide EIDL loans of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

10.   To obtain an EIDL loan, a qualifying business was required to submit an application to the SBA and provide information about the business's operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster.  In the case of EIDL loans for COVID-19 relief, the 12-month period was the 12-month period from January 31, 2019, to January 31, 2020.  The applicant was also required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

11.  EIDL loan applications were submitted directly to the SBA and processed by the agency with support from a government contractor.  The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the applicant about employment, revenue, and cost of goods sold, as described in paragraph 10 above.  Any funds issued under an EIDL loan were issued directly by the SBA.

12.  EIDL loan funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.  If the applicant also obtained a loan under the PPP, the EIDL loan funds could not be used for the same purpose as the PPP loan funds.

COMPANY 1

13.  Company 1 was a Wyoming-based corporation that specialized in selling aged "shelf companies" (i.e., companies that were created and existed without any operations but provided the imprimatur of an established entity) that were incorporated in New Mexico, Montana, and Wyoming.  The shelf companies were home-based businesses that were 100% owned by one person.  Individual 1 or a person/company affiliated with Individual 1 was listed as the registered agent for the shelf companies in the state of incorporation.  Upon receipt of an application and payment for an aged shelf company, Company 1 would provide various documents and services for each aged shelf company it sold, including Articles of Incorporation/Organization, a Certificate of Good Standing, an operating agreement and bylaws, and registered-agent services until the year following the year the shelf company was purchased.

14. Defendant SINGLETON purchased aged shelf company Finland Financial from Company 1 no later than in or around October 2013. Defendant SINGLETON purchased aged shelf company Finland Systemics from Company 1 in or around October 2019. Defendant SINGLETON purchased additional aged shelf companies from Company 1 between approximately July 2019 and July 2020.

RELEVANT FINANCIAL INSTITUTIONS & ACCOUNTS

15. Lenders A, B, C, D, and E were financial institutions within the meaning of 18 U.S.C. § 20 that were approved SBA lenders of PPP loans.

16. Banks 1, 2, and 3 were financial institutions within the meaning of 18 U.S.C. § 20.

17. Defendant SINGLETON controlled and/or was a signatory (in her legal name or using one of her aliases) on the following bank accounts:

a. A shared business checking account ending 6266 with defendant TUCKER at Bank 2 in the name of "Finland Systemics, Inc. DBA Finland Financial Inc." (the "Finland Bank 2-A Account");

b. A business savings account ending 9326 at Bank 2 in the name of "Finland Systemics, Inc. DBA Finland Financial Inc." (the "Finland Bank 2-B Account"); and

c. A shared private client checking account ending 2019 with defendant TUCKER at Bank 2 in the name of "Emanuel Tucker or Amber Singleton" (the "TUCKER/SINGLETON Bank 2 Account").

18. Defendant TUCKER controlled and/or was a signatory on the following bank accounts:

a. A shared business checking account and a shared private client checking account referenced above in Paragraph 17;

1          b.    A business savings account ending 6593 at Bank 1 in

2 the name of "Finland Financial Inc." (the "Finland Bank 1 Account");

3          c.    A business checking account ending 1660 at Bank 3 in

4 the name of "Drynk Inc." (the "Drynk Bank 3 Account"); and

5          d.    A business checking account ending 4548 at Bank 1 in

6 the name of defendant "Emanuel Tucker" (the "TUCKER Bank 1 Account").

7 B.   THE OBJECTS OF THE CONSPIRACY

8   19.  Beginning no later than in or around April 2020 and

9 continuing until at least in or around April 2022, in Los Angeles,

10 Orange, and Riverside Counties, within the Central District of

11 California, and elsewhere, defendants SINGLETON and TUCKER conspired

12 with one another and with others known and unknown to the Grand Jury

13 to commit: (a) wire fraud, in violation of Title 18, United States

14 Code, Section 1343; and (b) bank fraud, in violation of Title 18,

15 United States Code, Section 1344(2).

16 C.   THE MANNER AND MEANS OF THE CONSPIRACY

17   20.  The objects of the conspiracy were to be carried out, and

18 were carried out, in substance, as follows:

19          a.    Defendants SINGLETON and TUCKER and their co-

20 conspirators would submit and cause to be submitted online

21 applications for PPP and EIDL loans on behalf of active companies

22 that they owned and controlled, including aged shelf companies that

23 defendant SINGLETON had previously purchased.

24          b.    Defendants SINGLETON and TUCKER, together with other

25 co-conspirators, would knowingly make and cause to be made false

26 statements to financial institutions in connection with the

27 applications for PPP loans, including false statements about (i) the

28 number of employees at the company; (ii) the amount of average

1  monthly payroll for those employees; (iii) the truth and accuracy of

2  all the information and documents submitted in or with the

3  applications, including attached Internal Revenue Service ("IRS")

4  forms; and (iv) the intended use of the loan proceeds, including

5  false certifications that the loan proceeds would be used for

6  permissible business purposes.

7       c.   Defendants SINGLETON and TUCKER, together with other

8  co-conspirators, would knowingly make and cause to be made false

9  statements to the SBA in connection with the applications for EIDL

10  loans, including false statements about (i) the number of employees

11  at the company; (ii) the gross revenue for the 12-month period

12  preceding the identified disaster; (iii) the cost of goods sold in

13  the 12-month period preceding the identified disaster;(iv) the truth

14  and accuracy of all the information and documents submitted in or

15  with the applications; and (v) the intended use of the loan proceeds,

16  including false certifications that the loan proceeds would be used

17  for permissible business purposes.

18       d.   After the financial institutions and the SBA funded

19  the applied-for PPP and EIDL loans, respectively, defendants

20  SINGLETON and TUCKER and their co-conspirators would transfer and

21  cause to be transferred the proceeds of the fraudulently obtained

22  loans to bank accounts in their control.

23       e.   As part of their agreement with defendants SINGLETON

24  and TUCKER, co-conspirators would transfer portions of the loan

25  proceeds obtained as a result of the fraudulent applications to

26  defendants SINGLETON and TUCKER in the form of "kickback" payments.

27       f.   Defendants SINGLETON and TUCKER, together with other

28  co-conspirators, would use the fraudulently obtained PPP and EIDL

loan proceeds for their own personal benefit and for the benefit of their co-conspirators, including for non-business expenditures not permitted under the PPP and EIDL programs, such as luxury vehicles, residential properties, cryptocurrency, jewelry, and private jets.

g.   Defendants SINGLETON and TUCKER and their co-conspirators would apply for forgiveness of their PPP loans, falsely representing in the forgiveness applications that they had spent the PPP funds in manners consistent with the program's requirements.

21.   In total, between in or around April 2020 and in or around April 2022, defendants SINGLETON and TUCKER, together with their co-conspirators, submitted and caused the submission of at least 41 false and fraudulent PPP loan applications and at least 13 false and fraudulent EIDL loan applications, seeking a total of approximately $15.9 million in PPP and EIDL funds and resulting in the funding and disbursement of approximately $13.7 million in loan proceeds.  These fraudulent loan applications included loan applications for aged shelf companies that defendant SINGLETON had purchased from Company 1 on behalf of co-conspirators and transferred to those co-conspirators.

D.   OVERT ACTS

22.   On or about the following dates, in furtherance of the conspiracy and to accomplish its objects, defendants SINGLETON and TUCKER, together with other co-conspirators, committed and willfully caused others to commit the following overt acts, among others, in Los Angeles, Orange, and Riverside Counties, within the Central District of California, and elsewhere:

1     **<u>Finland Systemics</u>**

2     <u>Overt Act No. 1:</u>   On April 23, 2020, defendant SINGLETON,

3     together with other co-conspirators, submitted and caused to be

4     submitted to Lender B an application in the name of Finland

5     Systemics, seeking a PPP loan in the amount of $562,477, which:

6     (i) falsely represented that Finland Systemics had 27 employees and

7     an average monthly payroll of $224,991, (ii) included supporting

8     documents, including federal tax forms, that were false and

9     fraudulent, (iii) falsely certified that the applicant, defendant

10    SINGLETON, would use the loan proceeds only for permissible business

11    purposes, and (iv) falsely certified that all information submitted

12    in or with the loan application was true and accurate.

13    <u>Overt Act No. 2:</u>   On May 7, 2020, after Lender B wired

14    approximately $562,477 to Finland Bank 2-A Account, defendant

15    SINGLETON, together with other co-conspirators, caused $50,000 of the

16    Finland Systemics PPP loan proceeds to be wired from the Finland Bank

17    2-A Account to the Finland Bank 2-B Account.

18    <u>Overt Act No. 3:</u>   On March 17, 2021, defendant SINGLETON,

19    together with other co-conspirators, submitted and caused to be

20    submitted to Lender E a second-round PPP loan application in the name

21    of Finland Systemics, seeking a PPP loan in the amount of

22    $550,917.50, which: (i) falsely represented that Finland Systemics

23    had 27 employees and an average monthly payroll of $220,367,

24    (ii) included supporting documents, including federal tax forms, that

25    were false and fraudulent, (iii) falsely certified that the

26    applicant, defendant SINGLETON, would use the loan proceeds only for

27    permissible business purposes, and (iv) falsely certified that all

28

information submitted in or with the loan application was true and accurate.

Overt Act No. 4:   On April 16, 2021, defendant SINGLETON, together with other co-conspirators, submitted and caused to be submitted to Lender D a second-round application in the name of Finland Systemics, seeking a PPP loan in the amount of $550,832.50, which: (i) falsely represented that Finland Systemics had 27 employees and an average monthly payroll of $220,333, (ii) included supporting documents, including federal tax forms, that were false and fraudulent, (iii) falsely certified that the applicant, defendant SINGLETON, would use the loan proceeds only for permissible business purposes, and (iv) falsely certified that all information submitted in or with the loan application was true and accurate.

Overt Act No. 5:   On November 10, 2021, defendant SINGLETON, together with other co-conspirators, submitted and caused to be submitted to Lender B a fraudulent PPP forgiveness application seeking forgiveness for Finland Systemics' PPP loan from Lender B in the amount of $562,477.

Overt Act No. 6:   On February 24, 2022, defendant SINGLETON, together with other co-conspirators, submitted and caused to be submitted to Lender D a fraudulent PPP forgiveness application seeking forgiveness for Finland Systemics' PPP loan from Lender D in the amount of $550,732.50, which was granted.

Overt Act No. 7:   On August 18, 2020, defendant SINGLETON, together with other co-conspirators, submitted and caused to be submitted to the SBA an application in the name of Finland Systemics seeking an EIDL loan in the amount of $150,000, which application: (i) falsely represented that Finland Systemics had six employees,

including employees for whom it had paid wages and payroll taxes in 2019, and (ii) falsely certified that Finland Systemics would use the loan proceeds for permissible business purposes and that all information submitted in or with the application was true and correct.

**Finland Financial**

Overt Act No. 8:   On April 11, 2020, defendant TUCKER, together with other co-conspirators, submitted and caused to be submitted to Lender A an application in the name of Finland Financial, seeking a PPP loan in the amount of $199,500, which: (i) falsely represented that Finland Financial had ten employees and an average monthly payroll of $210,000, (ii) included supporting documents, including federal tax forms, that were false and fraudulent, (iii) falsely certified that the applicant, defendant TUCKER, would use the loan proceeds only for permissible business purposes, and (iv) falsely certified that all information submitted in and with the loan application was true and accurate.

Overt Act No. 9:   On May 25, 2020, defendant TUCKER, together with other co-conspirators, submitted and caused to be submitted to the SBA an application in the name of Finland Financial seeking an EIDL loan in the amount of $150,000, which application: (i) falsely represented that Finland Financial had five employees, including employees for whom it had paid wages and payroll taxes in 2019, and (ii) falsely certified that Finland Financial would use the loan proceeds for permissible business purposes and that all information submitted in or with the loan application was true and correct.

**Drynk**

Overt Act No. 10:   On April 15, 2020, defendant TUCKER, together with other co-conspirators, submitted and caused to be submitted to Lender C an application in the name of Drynk, seeking a PPP loan in the amount of $562,478, which: (i) falsely represented that Drynk had 35 employees and an average monthly payroll of $224,991, (ii) included supporting documents, including federal tax forms, that were false and fraudulent, (iii) falsely certified that the applicant, defendant TUCKER, would use the loan proceeds only for permissible business purposes, and (iv) falsely certified that all information submitted in or with the loan application was true and accurate.

Overt Act No. 11:   On March 30, 2021, defendant TUCKER, together with other co-conspirators, submitted and caused to be submitted to Lender D a second-round application in the name of Drynk, seeking a PPP loan in the amount of $596,736, which: (i) falsely represented that Drynk had 27 employees and an average monthly payroll of $238,694.40, (ii) included supporting documents, including federal tax forms, that were false and fraudulent, (iii) falsely certified that the applicant, defendant TUCKER, would use the loan proceeds only for permissible business purposes, and (iv) falsely certified that all information submitted in or with the loan application was true and accurate.

Overt Act No. 12:   On February 3, 2022, defendant TUCKER, together with other co-conspirators, submitted and caused to be submitted to Lender D a PPP forgiveness application seeking forgiveness for Drynk's second-round PPP loan from Lender D in the amount of $596,636, which was granted.

13

COUNTS TWO THROUGH SIX

[18 U.S.C. §§ 1343, 2(a)]

[ALL DEFENDANTS]

23.  The Grand Jury re-alleges paragraphs 1 through 18 and 20 through 22 of this Indictment here.

A.   THE SCHEME TO DEFRAUD

24.  Beginning no later than in or around April 2020 and continuing until at least in or around August 2021, in Los Angeles, Orange, and Riverside Counties, within the Central District of California, and elsewhere, defendants SINGLETON and TUCKER, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, intended to devise, and participated in a scheme to defraud financial institutions and the SBA, and to obtain money and property by means of material false pretenses, representations, and promises, and the concealment of material facts.

25.  The fraudulent scheme operated and was carried out, in substance, as described in paragraphs 20 through 22 of this Indictment.

B.   USE OF THE WIRES

26.  On or about the dates set forth below, in Los Angeles, Orange, and Riverside Counties, within the Central District of California, and elsewhere, for the purpose of executing the above-described scheme to defraud, defendants SINGLETON and TUCKER, aiding and abetting each other, transmitted and caused the transmission of the following items by means of wire and radio communication in interstate commerce:

14

| COUNT | DATE | ITEM WIRED |
|-------|------|------------|
| TWO | May 1, 2020 | Interstate wire transfer of $562,477 in PPP loan proceeds from Lender B into Finland Bank 2-A Account |
| THREE | May 4, 2020 | Interstate wire transfer of $199,500 in PPP loan proceeds from Lender A into Finland Bank 1 Account |
| FOUR | May 7, 2020 | Interstate wire transfer of $562,478 in PPP loan proceeds from Lender C into Drynk Bank 3 Account |
| FIVE | May 27, 2020 | Interstate wire transfer of $149,900 in EIDL loan proceeds from the SBA into Finland Bank 2-A Account |
| SIX | August 24, 2020 | Interstate wire transfer of $149,900 in EIDL loan proceeds from the SBA into Finland Bank 2-A Account |

COUNTS SEVEN THROUGH NINE

[18 U.S.C. §§ 1344(2), 2]

[ALL DEFENDANTS]

27.  The Grand Jury re-alleges paragraphs 1 through 18 and 20 through 22 of this Indictment here.

A.  THE SCHEME TO DEFRAUD

28.  Beginning no later than in or around April 2020 and continuing until at least in or around August 2021, in Los Angeles, Orange, and Riverside Counties, within the Central District of California, and elsewhere, defendants SINGLETON and TUCKER, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to obtain moneys, funds, credits, assets, and other property owned by and in the custody and control of federally-insured financial institutions by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

29.  The fraudulent scheme operated and was carried out, in substance, as described in paragraphs 20 through 22 of this Indictment.

B.  EXECUTIONS OF THE SCHEME

30.  On or about the following dates, in Los Angeles, Orange, and Riverside Counties, within the Central District of California, and elsewhere, defendants SINGLETON and TUCKER, together with others known and unknown to the Grand Jury, aiding and abetting each other, committed and willfully caused others to commit the following acts, each of which constituted an execution of the fraudulent scheme:

16

| COUNT | DATE | ACT |
|-------|------|-----|
| SEVEN | April 11, 2020 | Submission of fraudulent application for PPP loan to Lender A on behalf of Finland Financial |
| EIGHT | April 15, 2020 | Submission of fraudulent application for PPP loan to Lender C on behalf of Drynk |
| NINE | April 23, 2020 | Submission of fraudulent application for PPP loan to Lender B on behalf of Finland Systemics |

COUNT TEN

[18 U.S.C. § 1956(h)]

[ALL DEFENDANTS]

31.  The Grand Jury re-alleges paragraphs 1 through 18 of this Indictment here.

A.   THE OBJECTS OF THE CONSPIRACY

32.  Beginning no later than in or around April 2020 and continuing until at least in or around April 2022, in Los Angeles, Orange, and Riverside Counties, within the Central District of California, and elsewhere, defendants SINGLETON and TUCKER conspired with one another and with others known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Sections 1956 and 1957, to wit:

     a.   to knowingly conduct and attempt to conduct a financial transaction involving the proceeds of specified unlawful activity, that is, wire fraud and bank fraud, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

     b.   to knowingly engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, bank and wire fraud, in violation of Title 18, United States Code, Section 1957.

18

B.    THE MANNER AND MEANS OF THE CONSPIRACY

33.    The objects of the conspiracy were to be carried out, and were carried out, as follows:

a.    Defendants SINGLETON and TUCKER, together with other co-conspirators, would submit and cause the submission of fraudulent PPP and EIDL loan applications, which caused the SBA and SBA-approved lenders, including lenders who were federally insured financial institutions, to wire loan proceeds to bank accounts in the names of the entities used to obtain such loans.

b.    Defendants SINGLETON and TUCKER, together with other co-conspirators, would transfer and cause the transfer of the loan proceeds, including in financial transactions of $10,000 or greater, to secondary accounts under their control, in order to conceal the true nature, location, source, ownership, and control of the funds.

c.    Defendants SINGLETON and TUCKER, together with other co-conspirators, would transfer fraudulently obtained PPP and EIDL loan proceeds amongst one another, and use those proceeds to purchase luxury items and for other personal expenditures for their own benefit and for the benefit of their co-conspirators, including for expenses prohibited under the requirements of the PPP and EIDL programs.

C.    OVERT ACTS

34.    The Grand Jury re-alleges paragraph 22 of this Indictment, and incorporates by reference the monetary transactions set forth in Counts Eleven through Fourteen of this Indictment as a description of the overt acts, among others, committed and willfully caused to be committed in furtherance of the conspiracy and used to accomplish its objects, within the Central District of California.

COUNTS ELEVEN AND TWELVE

[18 U.S.C. § 1957]

[DEFENDANT SINGLETON]

35.  The Grand Jury re-alleges paragraphs 1 through 18 and 33 of this Indictment here.

36.  On or about the following dates, within the Central District of California, and elsewhere, defendant SINGLETON, and others known and unknown to the Grand Jury, knowingly engaged in a monetary transaction in criminally derived property of a value greater than $10,000, which funds in fact were derived from the proceeds of specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, and bank fraud, in violation of Title 18, United States Code, Section 1344(2), as alleged in Counts Two and Nine respectively, of this Indictment:

| COUNT | APPROX. DATE | TRANSACTION |
|-------|--------------|-------------|
| ELEVEN | May 7, 2020 | $50,000 transfer from Finland Bank 2-A Account to Finland Bank 2-B |
| TWELVE | May 7, 2020 | Wire of $14,418.56 from Finland Bank 2-A Account to SLS Mortgage |

COUNTS THIRTEEN AND FOURTEEN

[18 U.S.C. § 1957]

[DEFENDANT TUCKER]

37.  The Grand Jury re-alleges paragraphs 1 through 18 and 33 of this Indictment here.

38.  On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant TUCKER, and others known and unknown to the Grand Jury, knowingly engaged in a monetary transaction in criminally derived property of a value greater than $10,000, which funds in fact were derived from the proceeds of specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, and bank fraud, in violation of Title 18, United States Code, Section 1344(2), as alleged in Counts Three and Seven respectively, of this Indictment:

| COUNT | APPROX. DATE | TRANSACTION |
|-------|--------------|-------------|
| THIRTEEN | May 4, 2020 | Transfer of $100,000 from Finland Bank 1 Account to TUCKER Bank 1 Account |
| FOURTEEN | May 5, 2020 | $19,518.39 payment from TUCKER Bank 1 Account to a Chase credit card account |

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982]

1.      Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), in the event of the conviction of defendant AMBER SINGLETON, also known as ("aka") "Crystal Kelly," aka "Rebecca Lee," aka "Rebecca A Lee," aka "Rebecca Ann Lee," aka "Mia Lockett," aka "Mia Peire Lockett," aka "Crystal McClellan" or defendant EMANUEL TUCKER of the offenses set forth in any of Counts One through Nine of this Indictment.

2.      Any defendant so convicted shall forfeit to the United States of America the following:

(a) All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.      Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

1          FORFEITURE ALLEGATION TWO

2              [18 U.S.C. § 982]

3      1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4   Procedure, notice is hereby given that the United States will seek

5   forfeiture as part of any sentence, pursuant to Title 18, United

6   States Code, Section 982(a)(1), in the event of the conviction of the

7   conviction defendant AMBER SINGLETON, also known as ("aka") "Crystal

8   Kelly," aka "Rebecca Lee," aka "Rebecca A Lee," aka "Rebecca Ann

9   Lee," aka "Mia Lockett," aka "Mia Peire Lockett," aka "Crystal

10  McClellan" or defendant EMANUEL TUCKER of the offenses set forth in

11  any of Counts Ten through Fourteen of this Indictment.

12     2.   Any defendant so convicted shall forfeit to the United

13  States of America the following:

14          (a)   Any property, real or personal, involved in such

15  offense, and any property traceable to such property; and

16          (b)   To the extent such property is not available for

17  forfeiture, a sum of money equal to the total value of the property

18  described in subparagraph (a).

19     3.   Pursuant to Title 21, United States Code, Section 853(p),

20  as incorporated by Title 18, United States Code, Section 982(b)(1)

21  and (2), any defendant so convicted shall forfeit substitute

22  property, if, by any act or omission of said defendant, the property

23  described in the preceding paragraph, or any portion thereof: (a)

24  cannot be located upon the exercise of due diligence; (b) has been

25  transferred, sold to, or deposited with a third party; (c) has been

26  placed beyond the jurisdiction of the court; (d) has been

27  substantially diminished in value; or (e) has been commingled with

28  other property that cannot be divided without difficulty.

Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate

///

///

transactions involving a total of $100,000.00 or more in any twelve-month period.

A TRUE BILL

                                        /S/
                                        _____
                                        Foreperson

STEPHANIE S. CHRISTENSEN
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

KRISTEN A. WILLIAMS
Assistant United States Attorney
Deputy Chief, Major Frauds Section

VALERIE MAKAREWICZ
Assistant United States Attorney
Major Frauds Section

LORINDA I. LARYEA
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

JOSHUA N. DEBOLD
Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice

EDWARD E. EMOKPAE
Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice